IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EVELYN RAE ARNOLD, | ) | CASE NO. 1:21-cv-01752 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE |
| | ) | SOLOMON OLIVER, JR. |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | AMANDA M. KNAPP |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Evelyn Rae Arnold ("Plaintiff" or "Ms. Arnold") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter

has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

### I.  Procedural History

In August and December 2016, Plaintiff filed applications for DIB and SSI.  (Tr. 19, 310,

312.)  She alleged a disability onset date of March 21, 2015.  (*Id.*)  She alleged disability due to

high blood pressure, lumbar bulging disc, neuropathy, depression, and anxiety. (Tr. 353.)

1

Plaintiff's applications were denied at the initial level (Tr. 205, 214) and upon reconsideration (Tr. 224, 231), and she requested a hearing (Tr. 236).  On June 21, 2018, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 39-63.)

On October 15, 2018, the ALJ issued an unfavorable decision.  (Tr. 178-94.)  Ms. Arnold appealed, and the Appeals Council vacated the hearing decision and remanded Plaintiff's case back to an ALJ on February 20, 2020. (Tr. 200.)  A second hearing was held before the ALJ On July 7, 2020.  (Tr. 64-94.)

On July 28, 2020, the ALJ issued a new decision finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from March 21, 2015 through the date of the decision.  (Tr. 16-33.)  On July 26, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1.)

On September 9, 2021, Plaintiff filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 9, 10, 11.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Arnold was born in 1954, and was 60 years old on the alleged disability onset date, making her an individual closely approaching retirement age under Social Security Regulations. (Tr. 111.)  She had at least a high school education.  (Tr. 354.)  She performed work as a tax preparer at H & R Block in the first quarter of 2018 and 2019, which qualified as substantial gainful activity.  (Tr. 23.)  Nevertheless, there were continuous 12-month periods during the relevant time when Ms. Arnold did not engage in substantial gainful activity.  (Tr. 23.)

**B.      Medical Evidence**

Ms. Arnold's sole assignment of error challenges the ALJ's analysis of treating physician Antwon Morton. D.O.'s medical opinion.  (ECF Doc. 9 p. 3.)  The evidence summarized herein is accordingly focused on the evidence relevant to that opinion.

**1.      Relevant Treatment History**

On March 9, 2015, Ms. Arnold was treated by Antwon Morton, D.O. in the MetroHealth Department of Physical Medicine and Rehabilitation for worsening low back pain.  (Tr. 488.) She reported using a TENS unit twice a day and taking Tylenol twice a day for pain.  (*Id*.)  She also reported that her pain was aggravated by sitting in one position for too long, bending over, and walking.  (*Id*.)  On examination, her lumbar lordotic curvature was decreased and her range of motion was moderately decreased in all planes (trunk flexion up to 70 degrees).  (Tr. 490.) Palpatory exam revealed tenderness at the lumbosacral junction and lumbo-sacral spinal muscles bilaterally.  (*Id*.)  Provocative testing, including standing and seated flexion tests, sacroiliac joint compression, and Thomas and Faber's tests, caused increased back pain.  (*Id*.)  Sensation, motor strength, fine motor coordination, and gait were all normal.  (*Id*.)  Dr. Morton diagnosed mild lumbar spondylosis.  (Tr. 489.)  He instructed her on a home exercise program, prescribed Tylenol, and noted she "would like to try conservative measure[s] at this time."  (Tr. 490-91.) He advised her to return in three months.  (*Id*.)

Ms. Arnold returned to Dr. Morton on July 20, 2015, reporting that her pain had worsened over the past three weeks and was now at a level on seven on a scale of one to ten. (Tr. 482.)  She was inconsistent with her home exercise program and found the Tylenol only eased her pain for about an hour before symptoms returned.  (*Id*.)  Examination results were unchanged.  (Tr. 484.)  Although Ms. Arnold reported gait problems, Dr. Morton observed her

gait was normal.  (Tr. 483-84.)  She told Dr. Morton that she wanted to continue with the home exercise program rather than attempting formal physical therapy.  (Tr. 484.)  Dr. Morton continued her Tylenol, prescribed a Medrol dosepack to use as needed, and advised her to call in a week if her pain did not improve.  (*Id*.)

On December 7, 2015, Ms. Arnold was seen by King Ogbodu, M.D. in Dr. Morton's office.  (Tr. 474.)  She reported ongoing sharp and achy pain across her lower back, with a pins and needles sensation radiating down her thigh to her right knee.  (Tr. 475.)  The pain was improved with hot showers and by using her TENS unit.  (*Id*.)  She was taking Tylenol two or three times a day.  (*Id*.)  Examination results were unchanged, except that provocative testing caused increased back pain on the right side.  (Tr. 477.)  Dr. Ogbodu prescribed aquatic therapy, continued her Tylenol, and advised her to return in three months.  (*Id*.)

On February 5, 2016, Ms. Arnold's primary care provider noted that she had sought emergency treatment for severe pain in her low back radiating into her buttocks and leg.  (Tr. 464.)  She reported that she could not walk due to the pain.  (*Id*.)  She was prescribed tramadol and advised to keep her appointment with Dr. Morton in three days.  (Tr. 465.)

Ms. Arnold returned to Dr. Morton on February 8, 2016, reporting ongoing and worsening low back pain with left leg weakness and numbness.  (Tr. 461-62.)  She described her pain as sharp and achy, located across the low back, and nine on a scale of one to ten.  (Tr. 462.)  She reported a "pins/needles sensation" that radiated down the posterior aspect of the thigh to her left foot.  (*Id*.)  Dr. Morton noted she had undergone physical therapy in the past but stopped when pain flared up recently.  (*Id*.)  He also noted that an x-ray of Ms. Arnold's lumbar spine taken November 9, 2015 showed degenerative arthritic changes involving the facet joints at the L4-L5 and L5-S1 levels, and a grade 1 anteri olisthesis of L4-L5.  (*Id*.)  On examination, Ms.

4

Arnold's lumbar lordotic curvature was decreased and her range of motion was moderately

decreased in all planes (trunk flexion up to 75 degrees).  (Tr. 463.)  Palpatory exam revealed

tenderness at the lumbosacral junction and right sacroiliac joint, and straight leg testing was

positive on the left.  (*Id*.)  Provocative testing, including seated flexion test, sacroiliac joint

compression, and Thomas and Faber's tests, caused increased right sided back pain.  (*Id*.)  Her

motor strength was normal except for 4/5 in her left hip and knee, her fine motor coordination

was normal, and her gait was antalgic.  (Tr. 464.)  Dr. Morton observed she had an antalgic gait

without using a walker.  (*Id*.)  He ordered an MRI of her spine, started her on gabapentin for

pain, and advised her to return in four weeks.  (*Id*.)

Ms. Arnold underwent MRI imaging of her lumbar spine on February 17, 2016, and the

reviewing provider noted the following impression:

> Mild degenerative disease at L4-5 resulting in moderate right and mild left neural
> foraminal stenosis.  Findings are similar to the prior examination from 2014.  No
> significant stenosis elsewhere in the lumbar spine.

(Tr. 741-42.)

On April 18, 2016, Ms. Arnold returned to Dr. Morton for treatment of ongoing but

"much improved low back pain with left leg weakness and numbness."  (Tr. 454.)  She described

her pain as five on a scale of one to ten.  (*Id*.)  Dr. Morton noted that she wanted to start back

into aqua therapy.  (*Id*.)  She reported that Tylenol and Percocet had not helped with her pain

significantly, but "Tramadol and Gabapentin seem to manage the pain well."  (*Id*.)  Dr. Morton

observed that an MRI of Ms. Arnold's lumbar spine from March 4, 2016 showed:

- moderate right and mild left neural foraminal stenosis;

- disc uncovering, mild disc bulge, and bilateral facet joint arthropathy at
  the L4-L5 level; and

- a mild generalized disc bulge at the L5-S1 level.

(Tr. 454-55.)  Examination results were unchanged.  (Tr. 456.)  Dr. Morton continued her

medications and advised her to return in three months.  (Tr. 457.)  He noted that she had planned

a two-month trip to Alaska and wanted to start aqua therapy when she returned.  (Tr. 454, 457.)

Ms. Arnold returned to Dr. Morton on July 11, 2016, reporting "much improved low back

pain with left leg weakness and numbness."  (Tr. 449-50.)  She had just returned from a visit

with her daughter in Alaska.  (Tr. 450.)  Examination results were unchanged, except that Dr.

Morton also observed pain with lumbar facet load testing bilaterally.  (Tr. 452.)  He assessed

acute chronic lumbar radicular symptoms, gait disturbance, and muscle tightness, continued her

prescriptions for gabapentin and tramadol, and referred her for aqua therapy.  (*Id*.)

## 2.    Opinion Evidence

### i.    Physical Consultative Examination[1]

On February 22, 2017, Eulogio Sioson, M.D. performed a consultative physical

examination.  (Tr. 565.)  Ms. Arnold complained of experiencing back pain for three years and

left leg pain for two years.  (*Id*.)  She reported her low back pain sometimes radiated down her

left leg after walking for twenty minutes, going up or down ten steps, standing for twenty

minutes, or sitting for thirty minutes.  (*Id*.)  She stated she had been using a prescribed rolling

walker with a seat since 2015.  (*Id*.)  Dr. Sioson noted that she walked in pushing her rolling

walker and had a slight limp.  (Tr. 566.)  On examination, Ms. Arnold demonstrated moderate

lower back tenderness.  (*Id*.)  Straight leg testing was positive up to 25 and 20 degrees with non-

radicular back pains.  (*Id*.)  Dr. Sioson assessed her with back pain and hypertension.  (*Id*.)  He

opined that there were no objective findings that would significantly affect walking, standing,

---

[1]  Because Ms. Arnold's sole assignment of error challenges only the ALJ's analysis of Dr. Morton's opinion regarding her physical RFC, the examination findings and opinion of psychological consultative evaluator Herschel Pickholtz, Ed.D. (Tr. 557-64) will not be discussed herein.

sitting, lifting, carrying, and handling, but also opined that "if one considers her pain and above findings, work-related activities could be limited to sedentary work." (*Id*.)

### ii. Opinion of Plaintiff's Medical Provider

Dr. Morton completed a treating source statement dated On August 29, 2016. (Tr. 552-55.) He explained that he had treated Ms. Arnold every three or four months since March 2015. (Tr. 552.) He was unsure when her symptoms had first appeared, but described them as "chronic." (*Id*.) He opined that she would likely be off-task 20% of a workday and absent two times per month. (*Id*.) He also opined that she had the following physical functional limitations:

- frequently lift/carry up to 10 pounds;

- occasionally lift/carry up to 50 pounds;

- rarely lift/carry 100 pounds;

- never lift/carry greater than 100 pounds;

- sit for 6 hours;

- stand for 4 hours;

- walk for 2 hours;

- would require the use of a walker;

- could ambulate for less than one block without the use of a walker;

- frequently use bilateral feet for foot controls;

- occasionally climb stairs/ramps and balance;

- rarely climb ladders/scaffolds, stoop, kneel, crouch, or crawl;

- occasionally be exposed to mechanical parts, operate a vehicle, humidity/wetness, dust/odors/fumes/pulmonary irritants, extreme cold, and extreme heat; and

- rarely be exposed to unprotected heights and vibrations.

(Tr. 553-55.)  Dr. Morton identified the March 2016 MRI results and her diagnoses of bilateral facet arthropathy as the basis for his opined lifting and carrying limitations.  (Tr. 553.)  He identified pain as the basis for his sitting, standing, walking, lifting, and carrying limitations. (*Id*.)  He did not identify medical or clinical findings supporting his other opined limitations, including his opinion as to off-task behavior and absenteeism.

### iii.        State Agency Medical Reviewers[2]

On March 7, 2017, state agency reviewing physician Lynne Torello, M.D. reviewed the record and opined that Ms. Arnold had the following physical RFC limitations:

- occasionally lift/carry 10 pounds;

- frequently lift/carry less than 10 pounds;

- stand/walk for a total of 4 hours;

- sit for a total of about 6 hours in an 8-hour workday;

- frequently balance;

- occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl;

- never climb ladders/ropes/scaffold; and

- avoid all exposure to hazards such as unprotected heights, hazardous machinery, and commercial driving.

(Tr. 123-25.)  On May 9, 2017, state agency reviewing physician Leigh Thomas, M.D. reviewed the record and concurred with the earlier opinion of Dr. Torello.  (Tr. 157-58.)

---

[2]  Because Ms. Arnold's sole assignment of error challenges only the ALJ's analysis of Dr. Morton's opinion regarding her physical RFC, the opinions of state agency psychological reviewers Aracelis Rivera, Psy.D. and Irma Johnston, Psy.D. (Tr. 121-22, 138-39, 154-55, 168-69) will not be discussed herein.

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At her July 7, 2020 hearing, Ms. Arnold testified that her back had gotten worse as time went on.  (Tr. 75.)  She slept only four hours per night before she was woken by pain, and it was hard to go back to sleep, so she was often groggy.  (Tr. 76.)  She could stand for fifteen minutes to half an hour before she had to sit down.  (Tr. 74.)  When she sat on something soft, she sometimes got a cramp in her back.  (Tr. 75.)  She could not sit long in a hard chair.  (*Id*.)  She could lift no more than fifteen pounds on a good day.  (Tr. 76.)  On a particularly bad day, she could hardly even get up to go to the bathroom.  (Tr. 76-77.)

She also testified that her leg issues made it hard to walk.  (Tr. 77.)  She had used a walker or a cane the majority of the time since she had a stroke in January 2020.  (Tr. 77, 79.)  She used a walker "probably four times a week and that would include probably going out five, no more than six times a week."  (Tr. 77.)  After her stoke, reaching over her head made her dizzy.  (Tr. 78.)  The cane made her a little bit more stable.  (Tr. 79.)  Sometimes she had a sharp pain down her legs that made it hard to lift her legs, even with the walker.  (Tr. 80.)  She would need to sit down somewhere soft until the pain passed.  (Tr. 81.)

With regard to activities of daily living, she could not mop the floor or stand long enough to prepare a full meal.  (Tr. 74.)  She could wash her own hair but sometimes had trouble getting out of the bathtub because of pain.  (Tr. 82.)  Sometimes she had difficulty getting her shirt over her head.  (*Id*.)  She drove about four times per month for short local trips.  (Tr. 69.)  She only went out four to six times per week.  (Tr. 77.)  She napped during the day because gabapentin made her sleepy.  (Tr. 81.)

In 2018 and 2019, Ms. Arnold worked at H&R Block as a tax preparer from January through the beginning of April.  (Tr. 70.)  She worked less than eight hours per day, three or four days per week, and the job involved no lifting.  (*Id*.)  She also reported some part-time work as a babysitter, but said she could not watch infants or toddlers after March 2015, and was limited to caring for school-aged children.  (Tr. 70-71.)  If she had a bad day, she said she could not babysit at all.  (Tr. 84.)  Before her babysitting job, she worked as a receptionist at a law firm, where she was not required to lift more than twenty pounds.  (Tr. 73.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 86.)  The VE testified that the hypothetical individual of Plaintiff's age, education, and work experience, and with the function limitations described in the ALJ's RFC determination, could perform Ms. Arnold's past work as a tax preparer or receptionist.  (Tr. 87-92.)  The VE further testified that the physical functional limitations specified in Dr. Morton's opinion - except for the limitations relating to absence and time off task – would not affect a hypothetical individual's ability to perform Ms. Arnold's prior work.  (Tr. 87-88, 90-92.)  If an individual were to be absent more than one day per month, the VE testified that all work would be precluded.  (Tr. 92.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

10

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[3]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her July 28, 2020 decision, the ALJ made the following findings:[4]

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2020.  (Tr. 23.)

2.     The claimant engaged in substantial gainful activity during the following periods:  January 2018 to March 2018 and January 2019 to March 2019 (*Id.*)

3.     However, there was a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.  (*Id.*)

4.     The claimant has the following severe impairments: degenerative disc disease of the lumbar spine with spondylolisthesis, lumbosacral spondylosis, lumbar radiculopathy, lumbar spondylosis and stenosis, grade 1 anterolisthesis, cerebrovascular accident degenerative/chronic microvascular ischemic changes, atherosclerotic calcification of carotid siphons, and right rotator cuff tendonitis.  (*Id.*)

5.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 25.)

6.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is never able to climb ladders, ropes, and scaffolds; occasionally able to climb ramps and stairs, and stoop; and frequently able to balance, kneel, crouch, and crawl. She is frequently able to reach with her right upper extremity. She can sit 6 hours in an 8 hour workday. She can stand and/or walk 6 hours in an 8 hour workday.  (Tr. 26-27.)

7.     The claimant is able to perform past relevant work as a tax preparer and receptionist.  This work does not require the performance of work-related

---

[4] The ALJ's findings are summarized.

activities precluded by the claimant's residual functional capacity.  (Tr. 31.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 21, 2015, through the date of the decision on July 28, 2020.  (Tr. 33.)

## V. Plaintiff's Arguments

Ms. Arnold argues a single assignment of error, that the ALJ's RFC determination is unsupported by substantial evidence because she failed to properly evaluate the opinion of treating physician Antwon Morton, D.O.  (ECF Doc. 9 p. 3.)

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to

13

any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **Whether ALJ Failed to Properly Weigh Treating Opinion of Antwon Morton, D.O.**

Ms. Arnold asserts that the ALJ's RFC determination was not supported by substantial evidence because she failed to properly weigh the opinion of her treating physician, Dr. Morton. (ECF Doc. 9 pp. 9-10.)  In particular, she asserts that the ALJ did not provide "good reasons" for giving Dr. Morton's opinion only partial weight and "selectively read from the medical record in reaching her conclusion." (*Id*. at pp. 11-12.)  The Commissioner responds that the ALJ appropriately articulated why she gave Dr. Morton's opinion only partial weight, and that her decision was supported by substantial evidence. (ECF Doc. 10 p. 1.)

Under the governing regulations "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in the case record.'" *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ gives a treating source's opinion less than controlling weight, she must provide "good reasons" for the weight she assigns. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec*., 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ should consider:(1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec*., 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

The "good reasons" provided by the ALJ "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

15

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."
*Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec.
Admin. July 2, 1996)) (internal quotations omitted).  However, an ALJ is not required to provide
"an exhaustive factor-by-factor analysis" of the factors considered when weighing medical
opinions.  *See Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011); *Biestek v.
Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) ("The ALJ need not perform an
exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both
her decision not to afford the physician's opinion controlling weight and for her ultimate
weighing of the opinion.") (citing *Francis*, 414 F. App'x at 804-05).

In his August 29, 2016 opinion, Dr. Morton checked boxes indicating Ms. Arnold would
likely be off-task 20% of a typical workday and absent two times per month.  (Tr. 552.)  He also
checked boxes indicating she could frequently lift or carry up to ten pounds, occasionally lift or
carry up to fifty pounds, rarely/never lift or carry higher weights.  (Tr. 553).  He identified the
2016 MRI results and diagnosis of bilateral facet arthropathy as the clinical findings supporting
these limitations.  (*Id*.)  He then checked boxes indicating Ms. Arnold could sit for six hours,
stand for four hours, and walk for two hours.  (*Id.*)  He identified pain as the basis for the sitting,
standing, walking, lifting, and carrying limitations.  (*Id*.)  He checked "yes" that Ms. Arnold
would need an assistive device at least some of the time, writing she would require a "walker"
and could ambulate less than one block without one.  (*Id*.)  He did not identify clinical findings
to support his opinion regarding the walker.  (*Id.*)  He also checked boxes indicating Ms. Arnold
could: frequently use bilateral foot controls; occasionally climb stairs/ramps and balance; rarely
climb ladders/scaffolds, stoop, kneel, crouch, or crawl; occasionally be exposed to mechanical
parts, humidity/wetness, pulmonary irritants, extreme temperatures; occasionally operate a

vehicle; and rarely be exposed to unprotected heights/vibrations.  (Tr. 554-55.)  He did not identify supporting clinical findings for these limitations.  (Tr. 555.)

> The ALJ explained the weight she assigned to Dr. Morton's opinion as follows:
>
> Antwon Morton, D.O., opined that the claimant could perform a range of light work with postural, manipulative, and environmental limitations; but the claimant would be off task 20% of an eight-hour workday and absent for two or more days each month (B2F). Dr. Morton further opined that the claimant required the use of a walker to ambulate, and that she was only able to walk for less than a block without an assistive device (B2F). The undersigned gives partial weight to this opinion, with great weight given to the opined limitation to light work, and lesser weight to the remainder. A limitation to light weight is supported by Dr. Morton's treatment notes, which indicate normal physical examination findings of motor strength, sensation, and reflexes, findings of only some tenderness in the hip, back, and left leg, and moderately decreased range of motion, and mixed gait findings (B1F/10, 43, B8F/68, 77, 139, 179).  However, Dr. Morton's opinion also bear some internal inconsistencies with his treatment notes.  In July 2015, Dr. Morton noted that the claimant wished to treat her impairments conservatively, and was not a risk for falls at this time (B8F/42). By December 2015, Dr. Morton noted "no red flags" in the claimant's condition (B8F/75). These notes do not support the degree of off-task and absenteeism limitations opined by the source. Moreover, his other opined limitations bear some inconsistencies with the overall record. For example, the claimant testified she uses a walker when she feels like she might fall, and estimated she uses it as much as four time a week, despite admitting that she goes out up to six times a week, suggesting that a walker is not always required for her to ambulate (Hearing Testimony). Physical examinations show only moderately reduced range of motion and are inconsistent with the degree of postural limitations than indicated in Dr. Morton's opinion. Most recent MRI suggested there was no real change since 2014 (B8f/144). Finally, the undersigned notes that Dr. Morton's off-task limitations opinion regarding use of an assistive device is inconsistent with the opinion of the consultative examiner, who conducted an examination within six months of Dr. Morton's opinion (B4F). Accordingly, the undersigned finds that a less restrictive degree of limitations without the off-task, absenteeism, or accommodations providing for use of an assistive walker, is warranted.

(Tr. 30-31 (emphasis added).)

Ms. Arnold argues that the ALJ failed to provide "good reasons" for giving Dr. Morton's opinion only partial weight because she "selectively read from the medical record" in support of her findings.  (ECF Doc. 9 pp. 11-12.)  In support, she highlights a July 11, 2016 office visit

where Dr. Morton noted a reduced range of motion, tenderness, positive straight leg testing, pain

with provocative testing, pain with facet loading, and an antalgic gait on examination.  (ECF

Doc. 9 p. 12 (citing Tr. 450-52).)  In addition to the examination findings, the notes reflect that

she reported pain, weakness, and numbness, and discussed her use of pain medications and a

TENS unit.  (*Id.*)  The notes also indicate that Dr. Morton reviewed findings from her 2016 MRI

and 2015 lumbar x-ray.  (*Id.* at p. 13.)  Ms. Arnold argues that "[t]his probative evidence is

supportive and consistent with Dr. Morton's opinion," and that the ALJ "selectively read from

the treatment record to reach her conclusion."  (*Id.*)  Although not stated clearly, Ms. Arnold

appears to be arguing the ALJ failed to give "good reasons" for giving the opinion partial weight

because she did not discuss the findings from Ms. Arnold's July 2016 office visit notes.

The Sixth Circuit emphasizes "that all determinations [must] be made based upon the

record in its entirety."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing

*Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)).  It explains:

"This requirement that determinations be made in light of the record as a whole helps to ensure

that the focus in evaluating an application does not unduly concentrate on one single aspect of

the claimant's history."  *Rogers*, 486 F.3d at 249.

However, an ALJ is not "required to discuss each piece of data in [her] opinion, so long

as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v.

Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc.

Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)); *see also Thacker v. Comm'r of

Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (noting a "failure to discuss … observations does

not indicate that they were not considered" and "[a]n ALJ need not discuss every piece of

evidence in the record for his decision to stand").

18

In addition, to the extent the ALJ had already discussed specific evidence and findings earlier in her decision, she was not required to rearticulate those previous discussions to support her opinion analysis.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding ALJ need not "spell out every fact a second time").

Here, while the ALJ did not separately outline the findings from the July 2016 office visit, she did cite to the examination findings from that visit (and other office visits) in support of her opinion analysis, stating: "A limitation to light weight is supported by Dr. Morton's treatment notes, which indicate normal physical examination findings of motor strength, sensation, and reflexes, findings of only some tenderness in the hip, back, and left leg, and moderately decreased range of motion, and mixed gait findings."  (Tr. 31 (citing Tr. 451 (7/11/16 office visit), 484 (7/20/15 office visit), 666 (11/9/15 office visit), 675 (12/7/15 office visit), 737 (2/8/16 office visit), 777 (4/18/16 office visit)).)  She went on to explain that the "[p]hysical examinations show only moderately reduced range of motion and are inconsistent with the degree of postural limitations than indicated in Dr. Morton's opinion."  (*Id.*)  Earlier in her decision, she had also discussed the examination findings as follows:

> The medical record supports a degree of functional limitation. From time to time, the claimant reported back pain, leg pain, leg weakness, and numbness (B1F/9, 13, 23, 30, 41, B5F/3, B8F/66, 74, 88, 131, 222, B11F/60, B12F/8, B13F/1, 14, 56). However, despite these complaints, examinations generally showed normal physical examination findings of motor strength, sensation, and reflexes (B1F/43, B5F/6, B8F/68, 77, 139, 179, B13F/9). Examinations also showed some tenderness in the hip, back, and left leg, but only moderately decreased range of motion (B1F/10, 43, B5F/6, B8F/68, 77, 139, 179, B13F/9). Physical examinations

occasionally showed findings of antalgic gait, but the results were somewhat mixed (B1F/11, 15, 36, 39, 43, B5F/6, B8F/68, 77, 139).

(Tr. 28.)  Thus, a review of the ALJ's decision as a whole reveals that she considered Ms. Arnold's clinical findings of tenderness, decreased range of motion, and abnormal gait, and found them supportive of a limitation to light exertional work but inconsistent with the more substantial postural limitations set forth in Dr. Morton's opinion.

The ALJ also specifically addressed Ms. Arnold's lumbar spine imagery in her opinion analysis, noting that the "[m]ost recent MRI suggested there was no real change since 2014." (Tr. 31 (citing Tr. 742 (2016 MRI).)  The ALJ had already noted that the diagnostic imaging as a whole "corroborated the examination findings by showing degenerative changes in the lumbar spine."  (Tr. 28 (citing Tr. 484 (2014 MRI), 672 (2015 x-ray), 761 (2016 MRI), 793-94 (2016 MRI, 2015 x-ray), 1051 (2020 CT).)  Consistent with the ALJ's analysis and observations, the reviewing provider for Ms. Arnold's 2016 MRI had noted the following impression:

> Mild degenerative disease at L4-5 resulting in moderate right and mild left neural foraminal stenosis.  Findings are similar to the prior examination from 2014.  No significant stenosis elsewhere in the lumbar spine.

(Tr. 741-42.)   A review of the decision as a whole therefore makes it clear that the ALJ appropriately considered the spinal imagery discussed in Dr. Morton's July 2016 office visit notes in support of her analysis of Dr. Morton's opinion.

The other elements of the July 2016 office visit notes highlighted in Ms. Arnold's brief included her subjective complaints of pain, weakness, and numbness, and her reports of past or present use of physical therapy, pain medications, and a TENS unit.  (ECF Doc. 9 pp. 12-13.)  A review of the decision reveals that the ALJ acknowledged Ms. Arnold's complaints of pain and numbness (in testimony and to her providers), her reported use of therapy, medication, and a TENS unit, and her periodic use of a walker or cane.  (Tr. 27-28.)  Although Ms. Arnold testified

that she was prescribed a walker, the ALJ noted that "the record is … devoid of any medical prescription for this device," that she occasionally did not bring her walker to appointments and did not bring it to her 2018 hearing, and that her physical examination findings occasionally reflected a normal gait.  (Tr. 28-29.)  The ALJ also noted that Ms. Arnold was able to perform a variety of activities of daily living, despite her testimony regarding constant pain, which included vacations, grocery shopping, eating out, visiting friends and family, attending church, reading, watching television, knitting, and playing games.  (Tr. 29.)

In her analysis of Dr. Morton's opinion, the ALJ explicitly considered Ms. Arnold's limited treatment modalities, pointing out Dr. Morton's notation in July 2015 that Ms. Arnold "wished to treat her impairments conservatively" and was not at risk for falls, and his additional notation of "no red flags" in December 2015.  (Tr. 31.)  The ALJ found that "[t]hese notes do not support the degree of off-task and absenteeism limitations opined by" Dr. Morton.  (*Id.*)  With respect to Ms. Arnold's subjective complaints, the ALJ noted inconsistencies between the opined limitations and the overall record, including her testimony that she did not always require a walker to ambulate, the physical examination findings showing only moderately reduced range of motion, and an MRI showing no real change since 2014.  (*Id.*)  The ALJ also noted that Dr. Morton's opinion regarding Ms. Arnold's need for a walker was inconsistent with the opinion of consultative examiner Eulogio Sioson, M.D. that there were no objective findings that would significantly limit her functional abilities.  (*Id.* (citing Tr. 565-69).)

While Ms. Arnold has highlighted certain evidence that she argues "is supportive and consistent with Dr. Morton's opinion" (ECF Doc. 9 p. 13), that is not the operative question in this case.  Instead, it is well-settled that "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position,

so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Here, the ALJ explicitly considered the physical examination findings, spinal imagery, subjective complaints, and treatment modalities highlighted in Ms. Arnold's brief, and accounted for the impact of those factors on the weight given to Dr. Morton's opinion.  The ALJ set forth "good reasons" to support her decision to give partial weight to Dr. Morton's opinion, did not ignore or mischaracterize material evidence, and provided an analysis that was supported by substantial evidence.

For the reasons stated above, the undersigned finds that the ALJ provided "good reasons" to support her decision to give partial weight to the treating opinion of Dr. Morton, and that Ms. Arnold has not met her burden to demonstrate that the ALJ erred in her analysis of Dr. Morton's opinion or otherwise lacked substantial evidence to support the RFC determination.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

July 26, 2022

*/s/Amanda M. Knapp*

_____

AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).